## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

PETER GEORGOTAS and
GLAMOUR DOLLS, INC.,

                Plaintiffs,

     v.

RILLER GLAM LLC and SURIL
SHAH,

              Defendants.

Civil Action No._____
Hon._____
**JURY TRIAL DEMANDED**

Peter Georgotas ("Georgotas"), on behalf of Special Counsel to the Chapter 7 Bankruptcy Trustee[1] and Glamour Dolls, Inc. ("Glamour Dolls") (together, "Plaintiffs") bring this action against Defendants Riller Glam LLC ("Riller Glam") and Suril Shah ("Shah") (together, "Defendants") and allege as follows:

## NATURE OF ACTION

1.     This is an action to recover damages in connection with Defendants' breach of contract. Specifically, Defendants failed to provide strategic financing consulting services in exchange for shares in Glamour Dolls.

2.     Founded in 2014, Glamour Dolls is a cosmetics company that sells cruelty-free, vegan products to consumers.

---

[1] Counsel for Georgotas has been retained as Special Counsel to the Chapter 7 Trustee in connection with *In Re: Pansyotis Theodore Georgotas*, 20-23257-RG (Bankr. D. N.J.).

3.    In its early stages, Glamour Dolls successfully acquired deals with companies including AE Stores, Joyce Leslie, and Rainbow stores. Glamour Dolls was also featured on the Style Network and in Allure and Vogue magazines.

4.    Glamour Dolls continued its growth and success; in 2016, it entered into a collaboration deal with Lisa Frank and in 2017 it launched one of the most highly backed Kickstarter[2] accessories campaigns, shipping over three million units of product and garnering the attention of national press and retailers. In early 2018, Glamour Dolls received additional purchase orders from its long-time and loyal customer IPSY, a popular beauty subscription service that delivers personalized beauty products to its two million subscribers. IPSY quickly became Glamour Dolls' largest customer.

5.    At the time, Glamour Dolls primarily utilized the Kickfurther platform to finance its purchase orders. Ouiby Inc., d/b/a Kickfurther, ("Kickfurther"), is an online inventory financing platform that allows companies to access funds for production and orders that they are unable to acquire through traditional sources. However, Kickfurther carries high interest rates and requires personal guarantees of debt.

6.    In early 2018, Glamour Dolls decided to sell the majority of the equity owned by one of its co-founders, Jessica Romano.

7.    After evaluating its options, Glamour Dolls sold some of its shares to certain friends of Georgotas. One of the friends that planned to invest insisted that Plaintiffs also sell some of the shares of Glamour Dolls to Defendant Shah. The group that purchased shares, including Shah, formed LLCs and entered into a Stock Purchase Agreement ("SPA") with Georgotas to purchase

---

[2] Kickstarter is a crowdfunding platform utilized by individuals and companies to fund their projects.

the shares of Glamour Dolls.   In addition, through the SPA, Shah agreed to purchase additional shares in exchange for providing "sweat equity," which, Georgotas and Shah agreed would be twenty hours per month of "strategic consulting and/or marketing consulting."  The understanding and intention of the parties was that Defendants would help secure an alternative financing option to the onerous requirements involved with financing through Kickfurther.

8.      However, after signing the SPA, Defendants avoided their contractual obligations to provide consulting services to Glamour Dolls and failed to help to secure alternative means of financing.

9.      As a direct result of Defendants' failure to provide the contracted-for services (for which they received shares in Glamour Dolls) and their repeated false assurances to the contrary, Glamour Dolls ultimately faced significant manufacturing delays and lost its largest customer. Further, Georgotas assumed over half a million dollars in debt to Kickfurther.

10.     Georgotas was eventually forced to lay off the entire Glamour Dolls team, fall behind in payments to Glamour Dolls' primary lender, and file for personal bankruptcy.

## **PARTIES**

11.     Plaintiff Peter Georgotas is an individual who resides in Jersey City, New Jersey. Georgotas is the co-founder of Glamour Dolls.

12.     Plaintiff Glamour Dolls is a New Jersey corporation, with its principal place of business in New Jersey.

13.     Defendant Riller Glam LLC was a Kentucky Corporation which dissolved in December 2019.

14.     Defendant Suril Shah is an individual who, upon information and belief, resides in New York, New York.

3

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, Plaintiffs are citizens of New Jersey, Defendant Shah is a citizen of New York, and Defendant Riller Glam was at all times relevant to this Complaint incorporated in Kentucky.

16.     The Court has personal jurisdiction over Suril Shah because the claims against him arise out of his contacts with New Jersey.  Shah formed Riller Glam LLC, a Kentucky LLC, for the sole purpose of purchasing shares of a New Jersey Corporation and contracting to perform strategic financing consulting to a New Jersey Corporation.  Shah was the only member and officer of Riller Glam LLC and Riller Glam was an alter ego of Shah.

17.     The Court has personal jurisdiction over Riller Glam because it was formed for the sole purpose of purchasing shares of a New Jersey Corporation and contracting to perform strategic financing consulting to a New Jersey Corporation. Upon information and belief, Riller Glam LLC dissolved in 2019.

18.     Venue is proper in this District because a substantial part of the events or omissions giving rise to the claims here at issue occurred in this District, pursuant to 28 U.S.C. § 1391(b)(2).

## FACTUAL ALLEGATIONS

### Defendants Failed to Provide Strategic Financing Consulting Services

19.     Glamour Dolls is a cosmetics company that was founded by Peter Georgotas and Jessica Romano in 2014. Glamour Dolls products include cruelty-free, vegan eye products, lip products, skin products and cosmetic accessories. Glamour Dolls sells directly to customers and contracts with retailers and subscription services that sell its products.

20.    During its first year, Glamour Dolls acquired deals with companies including AE Stores and Rainbow Stores. As Glamour Dolls continued to successfully grow, in or about June of 2016, it also entered into a partnership with Lisa Frank, Inc. In 2017, Glamour Dolls recorded approximately $3.2 million in revenue. By 2018, Glamour Dolls estimated that it would generate approximately $5 to $7 million in gross sales.

21.    In early 2018, Glamour Dolls' largest customer was IPSY, a beauty subscription service that delivers personalized beauty products to its members. Over the years, Glamour Dolls also received interest and orders from major nationwide retailers such as Nordstrom, Ulta, Hot Topic, Kroeger and Walmart.

22.    Starting in 2015, Glamour Dolls primarily utilized the Kickfurther platform to finance its purchase orders. Kickfurther is an online inventory financing platform that allows companies to access funds that they are unable to acquire through traditional sources. Backers help fund inventory on consignment and then brands can repay buyers once they receive cash from sales of the products.

23.    Although Kickfurther can assist companies in obtaining financing that they would otherwise be unable to receive, the platform charges high interest rates and now requires personal guarantees of debt.

24.    Kickfurther was a viable option of financing for Glamour Dolls whereas more traditional methods, such as bank loans, were difficult to acquire for such a young, fast-growing company.

25.    In early 2018, with approximately $1 Million in pending orders and interest from additional retailers, Glamour Dolls decided to sell the majority of the equity owned by Jessica Romano in an effort to maintain the company's growth and relationships and because Glamour

Dolls was in search of alternative inventory funding.  Initially, Plaintiffs intended to seek private equity firms as potential buyers.

26.     Georgotas enlisted the assistance of his friends Brendan Brogan ("Brogan) and Daniel Oros ("Oros"), who helped evaluate potential deals with private equity firms.

27.     Brogan and Oros, while assisting Georgotas in evaluating potential sales to private equity firms, decided that they wished to invest in Glamour Dolls themselves.

28.     Further, on or about March 4, 2018, Brogan informed Georgotas that he would not invest in Glamour Dolls unless Georgotas also sold shares to Suril Shah, because Brogan said that he and Shah "do everything together" and that Shah was a "financial wizard" who would help find alternative financing for Glamour Dolls.

29.     In or about early March 2018, Shah called Georgotas with a proposal in which Shah, in addition to purchasing shares of Glamour Dolls, would also acquire Glamour Dolls' shares at an even lower valuation and price than others had purchased the shares.  Knowing that Glamour Dolls had roughly $1 Million in pending orders and additional retailer interest, in exchange for the additional shares, Shah's contribution would be: 1) assisting Georgotas in finding purchase order financing at a cheaper rate than provided by Kickfurther and, 2) working on a financial and accounting plan to reduce the cost of capital.

30.     Specifically, in exchange for additional shares, Shah agreed to provide twenty (20) hours per month of strategic consulting and/or marketing consulting, with the understanding that Shah's primary consulting role was to help connect Glamour Dolls with financing options that would provide a lower cost and less onerous access to capital than Kickfurther.  Shah and Georgotas' understanding was that Shah's twenty-hour per-month commitment was to continue

until Glamour Dolls could look for potential buyers or hire an executive team to run the Company, which it expected to be approximately three to five years.

31.     Despite his initial hesitancy to sell the shares at a lower valuation, Georgotas eventually agreed to Shah's proposal because Glamour Dolls was very interested in finding alternative financing to Kickfurther. Brogan also assured Georgotas that Shah's expertise in finance would provide Glamour Dolls with financing options at a lower cost of capital and without the need for Georgotas to personally guarantee debt, and further, would allow more time for Georgotas to focus on sales and product development.

32.     In an effort to help Shah learn more about the business, on or about March 7, 2018, Georgotas, Brogan, and Shah travelled to MGD Solutions, Inc. ("MGD Solutions") to visit MGD Solutions' design studio, warehouse, and distribution center and to meet the CEO of MGD Solutions, Scott Damast.  Glamour Dolls contracts with MGD for sourcing, logistics and back-office assistance to coordinate the manufacturing of Glamour Dolls' products.

33.     Following the visit to MGD Solutions, Brogan and Shah again assured Georgotas that Glamour Dolls would no longer need to rely on Kickfurther for financing.

34.     Brogan, Oros, and Shah decided that they would set up vehicles to purchase the shares of Glamour Dolls. Brogan set up BBCMB LLC, Oros set up DGO Holdings LLC, and Shah set up Riller Glam LLC.

35.     Shortly before the purchase was due to close, Shah told Georgotas that he wanted a portion of his shares to be sold to an individual named Darryl Schulte.  Georgotas was given little information on Shulte and eventually went to Oros who explained that Schulte was Brogan and Shah's business manager.

36.     On or about March 14, 2018, the parties entered into the SPA.

37.     Pursuant to the SPA, Brendan Brogan/BBCMB LLC purchased 375 shares for $50,000. Brogan signed the SPA.

38.     Daniel Oros/DGO Holdings LLC purchased 375 shares for $50,000. Oros signed the SPA.

39.     Suril Shah/Riller Glam LLC purchased 412.5 shares for $55,000 and received an additional 187.5 shares in exchange for twenty hours per month of strategic consulting and/or marketing consulting. Shah signed the SPA.

40.     Darry Schulte/SHG Glam LLC purchased 150 shares for $20,000. Darryl Schulte did not sign the SPA but provided the funds and received the shares.

41.     Following the signing of the SPA, Glamour Dolls and Georgotas expected that Shah would immediately begin his twenty hours per month of consulting by learning the business and financing models of Glamour Dolls. However, almost immediately after the SPA was signed, and despite significant pending orders and buyer interest from national retailers including Amazon, Walmart, Ulta, and Nordstrom, Shah began traveling for other purposes and was difficult to contact.

42.     On the rare occasions when Shah was on the east coast, he did not show an interest in learning about the Glamour Dolls business. Georgotas expressed concern about Shah to Brogan, who assured him that Shah "could be difficult" but again insisted it was worth it because Shah was a "finance wizard."

### Defendants' Failure to Provide Contracted-For Services Led to Glamour Dolls Losing its Biggest Customer

43.     On or about March 20, 2018, Glamour Dolls entered into two agreements with IPSY. There were corresponding purchase orders dated April 3, 2018, for 505,000 and 303,000 units of mascara respectively. The purchase orders called for delivery of a total of $404,000.00

worth of product and were standard orders from IPSY, which Glamour Dolls was experienced in fulfilling.

44.     In light of the agreement with Shah, Georgotas planned on financing this order through a new means that would be facilitated through the assistance and guidance of Shah.

45.     However, as manufacturing deadlines approached, Shah still had only dedicated minimal time to learning the business of Glamour Dolls.  Georgotas was finally able to persuade Shah to join him at a meeting at MGD Solutions' Manhattan office on or about April 24, 2018.

46.     Georgotas hoped that by attending the meeting, Shah would better understand the tight financing, manufacturing, and delivery timelines that were fast approaching for the upcoming IPSY purchase orders.

47.     At the meeting, among others, three members of the Glamour Dolls team were present, as was Scott Damast, CEO of MGD Solutions.

48.     Shah arrived late to the meeting, left the meeting early and was generally dismissive during the short time he was present. Nevertheless, at that meeting, Shah committed to ensuring that the pending IPSY purchase orders would be funded. Despite Shah's dismissive attitude at the meeting, Georgotas assured the team that there would be a positive outcome, as Shah had committed his efforts toward ensuring the purchase orders were financed. Further, Shah was fully aware of the looming deadlines, which were clearly laid out at the meeting.

49.     Following the meeting, Georgotas made several efforts to contact Shah, but Shah was completely unresponsive.  Importantly, after the meeting, Shah did not request any documents relating to the IPSY purchase orders for which he had promised to procure financing.

50.     On or about April 26, 2018, Georgotas again reached out to Shah, who indicated that he did not yet have financing for the purchase orders, and that he would discuss it with Georgotas at a later time.

51.     Shah never followed up with Georgotas, and most importantly failed to follow through with his promise to get the IPSY deal funded.

52.     As a result of Shah's failure to obtain financing for the IPSY purchase order, the Glamour Dolls team panicked at the prospect of missing a delivery deadline with IPSY, its largest customer. On or about May 1, 2018, Glamour Dolls' Chief Information Officer informed Georgotas that MGD Solutions was becoming concerned about the financing of the purchase orders as the manufacturing deadlines were approaching.

53.     It was already May and the delivery dates for the orders were July 16-20, 2018. Ideally, manufacturing would have started 75 to 90 days prior to the delivery dates, but as of May, Glamour Dolls did not even have funding for the deals.  The purchase orders should and could have been financed by the middle of April 2018, which would have provided sufficient time to start the manufacturing process.

54.     As Glamour Dolls had reached a critical juncture with regards to financing and manufacturing, Georgotas, out of desperation, reluctantly returned to Kickfurther. He began to organize a funding campaign on May 2, 2018, which was funded, but took significant time and effort and once again required Georgotas to follow the Kickfurther requirement that he personally guarantee the company debt.  Additionally, most of the profits from the impending sales now had to be committed to paying interest and increased logistics fees.  If Glamour Dolls had not been forced to commit those profits to paying interest on the Kickfurther loans and increased fees for logistics, the profits would have been utilized to pay off most of Glamour Dolls' pre-existing debt.

55.     In light of Defendants' failure to deliver the promised funding vehicles, the situation became so dire that Glamour Dolls did not even have time to wait for the Kickfurther funds to be deposited into its accounts before starting manufacturing.  At that point, Georgotas confronted Shah, who advised Georgotas that he suddenly had the money to help finance the purchase order, and on or about May 4, 2018, sent Georgotas a loan agreement for a bridge loan of $127,417.  Notably, Shah only provided the bridge loan because Georgotas had already raised the necessary money on Kickfurther and personally guaranteed the debt.   Further, before making the bridge loan, Shah also required Georgotas to personally guarantee the loan, which was paid back to Shah on or about May 17, 2018.

56.     Manufacturing of the products for the IPSY purchase order began far later than necessary. Had Georgotas known that Shah would not make good on his assurances to secure funding for the purchase orders, he could have begun the Kickfurther campaigns two months earlier, thereby avoiding missing critical manufacturing deadlines and correcting any quality control issues that may have arisen.

57.     Georgotas then ran a second campaign with Kickfurther beginning on May 30, 2018, again having to personally guarantee the debt. Between the two Kickfuther campaigns, Georgotas had to personally guarantee around $500,000.00 (plus interest) of Company debt.

58.     After Georgotas personally guaranteed the company debt a second time through a Kickfurther campaign, Georgotas—at that point in a panic about the manufacturing deadlines – requested a second bridge loan from Shah.  Shah eventually provided Georgotas with the second bridge loan; however, the second bridge loan was not provided until June 27, 2018.

59.     Unfortunately, by the time both bridge loans were offered, manufacturing should have been nearly completed.   Because manufacturing had not been completed on a regular

schedule, Glamour Dolls also incurred additional expenses because the process was so delayed that in order to meet delivery deadlines, production had to be shipped via air freight (rather than traditional shipping).  Air freight is significantly more expensive than traditional shipping but was a last resort to prevent a breakdown in the business relationship with IPSY.

60.     Because deadlines were once again looming due to Shah's failure to comply with his contractual obligations and repeated assurances, MGD Solutions pressed its factories to meet the production deadlines and delivery dates.  Due to overclocking[3] the machines to meet the impending deadlines, one of the cylinders cracked and caused damage to some of the products.

61.     On or about June 24, 2018, while additional orders were pending, Georgotas asked Shah to assist with financing pitches to banks, including M&T Bank ("M&T"), with which Glamour Dolls had a pre-existing relationship.  Shah initially agreed to meet with M&T, but then backed out.  As a result, on June 25, 2018, Georgotas (without Shah) met with M&T in an effort to increase a pre-existing revolving line of credit.  That request was eventually denied.

62.     Had the cylinder in the manufacturing machine not cracked due to overuse caused by Shah's delays, the products would not have been damaged.  Further, if there had been more time, the damaged goods might have been identified in the quality control process and held back from being shipped to IPSY.

63.     On July 30, 2018, because of the damage issues, IPSY told Glamour Dolls to wait before shipping new products in order to allow them time to determine exactly how many units were damaged.  Glamour Dolls absorbed the costs of a quality control inspection, which further cut into remaining profits at a cost of $26,308.65.

---

[3] "Overclocking" a machine refers to the practice of increasing the clock rate of a computer to exceed the speed certified by the manufacturer.

64.    In January 2019, IPSY continued to reject units due to the alleged defects.[4]

65.    Thus, Glamour Dolls continued to face expenses from rushed production and manufacturing defects that could have been prevented had Shah secured timely financing.

66.    Ultimately, Glamour Dolls lost its largest customer, IPSY, and Georgotas and Glamour Dolls were saddled with over $1 million of debt that could have been avoided had Shah complied with his contractual obligation to provide strategic consulting and secure financing for the purchase orders. Also, Glamour Dolls fell behind on paying back debts that were to be serviced by the profits from these IPSY orders.

67.    In or about late September and early October 2018, Georgotas was forced to lay off the entire Glamour Dolls team, as there was no money to meet payroll. Glamour Dolls also began defaulting on its M&T line of credit.  It was clear that Glamour Dolls desperately needed the financial and strategic consulting services that Defendants contracted to provide, but Shah was not providing those services.

68.    On or about December 5, 2018, Georgotas and Brogan had a call with a buyer from Ulta, a nationwide chain of cosmetics stores. The buyer was interested in carrying the Glamour Dolls products, but Glamour Dolls had no funding.  Unfortunately, at that point, Shah had unilaterally decided that he was no longer going to perform his contractual obligations.  In addition, Glamour Dolls could no longer utilize Kickfurther for financing because the orders with the manufacturing defects led to a dispute between Glamour Dolls and Kickfurther.   Prior to this termination of financing, Glamour Dolls had worked with Kickfurther since 2015 and completed

---

[4] Glamour Dolls offered to allow IPSY to return the defective units, which Glamour Dolls would then replace. However, unlike most retailers and wholesalers, IPSY's subscription service requires a tight one-week window for deliveries; if the products don't arrive on time, they can't be included in the IPSY subscription boxes that get shipped to their customers.

several successful financing campaigns that amounted to almost $2 Million in funding, all of which had been repaid by Glamour Dolls.

69.    On December 1, 2020, Georgotas filed for personal bankruptcy as a result of his assumption of debt related to personally guaranteeing the Kickfurther fundings. Had Shah procured funding as promised and not falsely led Georgotas to believe that funding was imminent, Georgotas would not have been forced to file for bankruptcy.

**Riller Glam LLC is an Alter Ego of Suril Shah**

70.    Riller Glam, a Kentucky LLC, was created in 2018 for the sole purpose of purchasing shares of Glamour Dolls.  It filed for incorporation on March 14, 2018, the same date of the agreement memorialized in the SPA.  Upon information and belief, Riller Glam dissolved in 2019.

71.    Shah was the sole owner, founder, member and officer of Riller Glam.

72.    Shah completely and exclusively dominated and controlled Riller Glam to the point that Riller Glam had no legal significance of its own. Shah and Riller Glam operated as a single economic entity.

73.    The facts set forth herein are such that adherence to the legal fiction of the separate existence of Riller Glam and Shah would promote injustice.  Plaintiffs were extensively injured by the conduct of Defendants – Glamour Dolls lost its biggest customer, it eventually had to lay off its entire team, and Georgotas was forced to file for bankruptcy.  To allow Shah to hide behind the legal fiction of Riller Glam would deprive Plaintiffs of damages to which they are entitled.

74.    Furthermore, as noted above, upon information and belief, Riller Glam LLC dissolved in 2019.  Under Kentucky law, Plaintiffs can proceed directly against Shah because, upon information and belief, he received the corporate assets of Riller Glam LLC. "Where a

14

corporation is dissolved or is consolidated its assets become a trust fund for the payment of its debts and may be reached by proceeding against the stockholders of the old company…" *Bear, Inc. v. Smith*, 303 S.W.3d 137, 146 (Ky. Ct. App. 2010) (citing *Reeves v. East Cairo Ferry Co*., S.W.2d 937, 938 (Ky. 1942). "Thus, the general rule holds that if a shareholder receives property from a dissolved corporation, that shareholder is liable to any unpaid credits of the dissolved corporation to the extent of the property received." *Id*.

### FIRST CLAIM FOR RELIEF
**Breach of Contract**
**Against Suril Shah and Riller Glam LLC**

75.    Plaintiffs repeat and reallege every allegation contained in the foregoing paragraphs as if fully set forth herein.

76.    Georgotas and Defendants entered into the SPA in March of 2018.

77.    Plaintiffs performed their obligations under the SPA by providing Defendants with the shares in Glamour Dolls.

78.    Defendants breached the SPA by failing to provide strategic financial consulting and assisting in securing funding for Glamour Dolls.

79.    As a result of Defendants' failure to satisfy their obligations under the SPA, Plaintiffs were forced to commence two Kickfurther financing campaigns, requiring Plaintiff Georgotas to personally guarantee over $500,000.00.

80.    Defendants' failure to provide financing also caused Plaintiff Glamour Dolls to lose its biggest customer, IPSY, as well as additional retail accounts. The delays caused problems in the manufacturing and quality control process. This led to Glamour Dolls shipping allegedly defective products to IPSY, which ultimately led to IPSY terminating its relationship with Glamour Dolls.

81.     Defendants' breach of the Agreement also caused, among other things, Glamour Dolls to lose key trade partners, the inability of Glamour Dolls to cover payroll, the termination of Glamour Dolls' key employees, and ultimately led to Plaintiff Georgotas filing for personal bankruptcy.

82.     As a direct and proximate result of Defendants' breach of contract, Plaintiffs suffered economic damages, loss of business, loss of businesses relations, and loss of sales and future sales.

**SECOND CLAIM FOR RELIEF**
**Breach of Implied Covenant of Good Faith and Fair Dealing**
**Against Suril Shah and Riller Glam LLC**

83.     Plaintiffs repeat and reallege every allegation contained in the foregoing paragraphs as if fully set forth herein.

84.     Georgotas and Defendants entered into the SPA in March of 2018.

85.     Every contract imposes on each party a duty of good faith and fair dealing in its performance. There is an implied covenant that neither party will do anything which will have the effect of injuring the right of the other party to receive the benefits of the contract.

86.     The SPA entered into by Georgotas and Defendants included an implied covenant of good faith and fair dealing.

87.     Defendants breached their duty of good faith and fair dealing because they failed to:

(a)     be available for Glamour Dolls' meetings;

(b)     review Glamour Dolls' strategic plans, business models, and financial structure; and

(c)     provide strategic consulting services on financing.

16

88.     As a direct and proximate result of Defendants' breach of the implied covenant of good faith and fair dealing, Plaintiffs suffered economic damages, loss of business, loss of businesses relations, and loss of sales and future sales.

### THIRD CLAIM FOR RELIEF
**Promissory Estoppel**
**Against Suril Shah and Riller Glam LLC**

89.     Plaintiffs repeat and reallege every allegation contained in the foregoing paragraphs as if fully set forth herein.

90.     Defendants made a clear and definite promise to Plaintiffs to provide strategic financial consulting services in exchange for shares in Glamour Dolls.

91.     Defendants made this promise with the expectation that Plaintiffs would rely upon it in making business decisions, including entering into purchase order agreements with customers.

92.     Plaintiffs reasonably relied upon Defendants' promise and provided them with the bargained-for shares.

93.     Plaintiffs entered into purchase order agreements with customers, including IPSY, expecting that in accordance with their promise, Defendants would provide strategic financial consulting services.

94.     Plaintiffs relied upon Defendants' promise to their detriment, and suffered economic damage, loss of business, loss of business relations, and loss of sales and future sales as a result.

### FOURTH CLAIM FOR RELIEF
**Unjust Enrichment**
**Against Suril Shah and Riller Glam LLC**

95.     Plaintiffs repeat and reallege every allegation contained in the foregoing paragraphs as if fully set forth herein.

17

96.     If Defendants dispute the existence of a binding written contract, then Defendants have been unjustly enriched as a result of a verbal agreement to provide strategic financial consulting services to Plaintiffs.

97.     In exchange for agreeing to provide strategic financial consulting services, Defendants retained the benefit of holding shares in Glamour Dolls.

98.     Defendants failed to provide the bargained-for strategic consulting services, causing Plaintiffs to lose their biggest customer, IPSY.

99.     Plaintiffs suffered economic damage, loss of business, loss of business relations, and loss of sales and future sales.

100.    It would be unjust for Defendants to retain the benefit of holding Glamour Dolls shares in light of their failure to provide the bargained-for services, resulting in Georgotas' bankruptcy and Glamour Dolls' loss of its biggest customer.

## **Prayer for Relief**

WHEREFORE, Plaintiffs respectfully request that the Court grant the following relief:

A.      An award of compensatory and consequential damages against Defendants;

B.      An award of attorneys' fees and costs against Defendants in this matter, to the extent and in the amount permitted by law;

C.      A declaratory judgment that Riller Glam LLC is Suril Shah's alter ego and that the corporate veil of Riller Glam LLC should be pierced;

D.      Pre-judgment and post-judgment interest, to the extent and in the amount permitted by law, and;

E.      Such other relief as the Court deems just and appropriate.

Dated: October 24, 2024

SPIRO HARRISON & NELSON

_/s/Adlai Small_
Adlai Small, Esq.
Marissa DeAnna, Esq.
363 Bloomfield Avenue, Suite 2C
Montclair, NJ 07042
Tel: (973) 744-2100
asmall@shnlegal.com