**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| PETER GEORGOTAS and GLAMOUR DOLLS, INC.,<br>Plaintiffs,<br>v.<br>RILLER GLAM LLC and SURIL SHAH,<br>Defendants. | No. 24-cv-10034<br><br>**OPINION & ORDER** |

**CECCHI, District Judge**.

Before the Court is defendants Riller Glam LLC ("Riller Glam") and Suril Shah's ("Shah") (collectively, "Defendants") motion to dismiss plaintiffs Peter Georgotas ("Georgotas") and Glamour Dolls, Inc.'s ("Glamour Dolls") (collectively, "Plaintiffs") first amended complaint ("FAC") pursuant to Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)"). ECF No. 22; *see* ECF No. 22-3 ("Moving Br."); ECF No. 21 ("FAC"). Plaintiffs opposed the motion, ECF No. 27 ("Opp'n Br."), and Defendants replied, ECF No. 28 ("Reply Br."). The Court decides the motion without oral argument. Fed. R. Civ. P. 78(b); L. Civ. R. 78.1(b). For the reasons stated below, the Court will grant in part and deny in part Defendants' motion.

## I. <u>BACKGROUND</u>

### A. Plaintiffs' Allegations

Plaintiff Georgotas is a New Jersey resident who cofounded plaintiff Glamour Dolls, a New Jersey corporation with its principal place of business in New Jersey. FAC ¶¶ 11–12. Defendant Shah is a New York resident who formed defendant Riller Glam, a Kentucky corporation which dissolved in December 2019, to purchase shares of Glamour Dolls. *Id.* ¶¶ 14, 16, 71. This case arises out of that investment, including Shah's alleged promise to assist Georgotas in finding purchase order financing in exchange for equity in Glamour Dolls.

Founded in 2014 by Georgotas and Jessica Ramos ("Ramos"), Glamour Dolls is a vegan, cruelty-free cosmetics company that sells its products directly to consumers, as well as through retailers and subscription services. *Id.* ¶¶ 2, 19. By its third year, Glamour Dolls had "recorded approximately $3.2 million in [annual] revenue" and had deals with "AE Stores" and "Rainbow Stores." *Id.* ¶ 20. It had also "received interest and orders from major nationwide retailers such as Nordstrom, Ulta, Hot Topic, Kroeger[,] and Walmart," as well as orders from "IPSY, a beauty subscription service" that was its largest customer. *Id.* ¶¶ 20–21, 53.

To finance its purchase orders, Glamour Dolls "primarily utilized" Kickfurther, "an online inventory financing platform that allows companies to access funds that they are unable to acquire through traditional sources" like bank loans. *Id.* ¶¶ 22, 24. Through Kickfurther, "[b]ackers help fund inventory on consignment and then brands can repay [backers] once they receive cash from sales of the products." *Id.* ¶ 22. However, the platform charges "high interest rates and . . . requires personal guarantees of debt." *Id.* ¶ 23.

In early 2018, faced with approximately $1 million in pending orders, interest from additional retailers, and challenges related to inventory financing, Plaintiffs decided to facilitate the sale of cofounder Ramos's equity in Glamour Dolls. *Id.* ¶ 25. To do so, Georgotas enlisted the help of two friends, Brendan Brogan ("Brogan") and Daniel Oros, who ultimately "decided that they wished to invest in Glamour Dolls themselves." *Id.* ¶ 27. In March 2018, Brogan told Georgotas that "he would not invest . . . unless Georgotas also sold shares to . . . [defendant] Shah, because Brogan said that he and Shah 'do everything together.'" *Id.* ¶ 28.

That same month, Shah sent Georgotas a proposal. Specifically, Shah proposed that, in addition to purchasing Ramos's Glamour Dolls shares in exchange for cash, he would acquire additional Glamour Dolls shares in exchange for twenty hours of strategic consulting per month.

*Id.* ¶¶ 29–30. Shah—knowing that Glamour Dolls faced $1 million in pending orders—proposed (1) "assisting Georgotas in finding purchase order financing at a cheaper rate than provided by Kickfurther" and (2) "working on a financial . . . plan to reduce the [company's] cost of capital." *Id.* ¶ 29. According to Plaintiffs, "Shah and Georgotas'[s] understanding was that Shah's twenty-hour per-month commitment was to continue [until] Glamour Dolls [had grown] to a point where it made sense to consider potential buyers, go public, or hire an executive team to run the Company privately," which they expected would take approximately three to five years. *Id.* ¶¶ 30–31. As a part of these discussions, Georgotas, Brogan, and Shah travelled to the facilities of MGD Solutions, Inc. ("MGD"), the company Glamour Dolls used for "sourcing, logistics[,] and back-office assistance" in the manufacture of its products. *Id.* ¶ 32. After the visit to MGD, Shah "assured Georgotas that Glamour Dolls would no longer need to rely on Kickfurther." *Id.* ¶ 33.

Shortly before closing, Shah "set up Riller Glam" as a "corporate vehicle[] to purchase [Glamour Dolls] shares." *Id.* ¶ 34; *see also id.* ¶ 71 (alleging that Riller Glam filed for incorporation on "the same date" that the parties executed their agreement). Shah was the "sole owner, founder, member[,] and officer of Riller Glam" and operated the LLC out of the same location used for all of his other business ventures. *Id.* ¶ 74. He also used "his personal email address for Riller Glam business." *Id.*

On March 14, 2018, Riller Glam and Georgotas (among others) entered into a stock purchase agreement (the "SPA"), whereby Riller Glam received 412.5 shares for $55,000, plus an additional 187.5 shares "in exchange for twenty hours per month of strategic consulting and/or marketing consulting." *Id.* ¶ 39; *see also* ECF No. 22-2, Ex. A ("SPA").[1] Relevant here, neither

[1] The Court can consider the SPA, because it is specifically referenced in and integral to the FAC. *See Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014).

Glamour Dolls nor Shah were parties to the SPA, though Shah did sign on behalf of Riller Glam. FAC ¶¶ 34, 39, 41; SPA at 6; Moving Br. at 2, 13–14; Opp'n Br. at 14. However, the SPA provided that "the injured party or the Corporation (defined as 'Glamour Dolls, Inc.') shall be entitled to remedies in action at law or in equity" and "Georgotas . . . expected to loan all but $25,000 of the profits for the share sales to Glamour Dolls." FAC ¶ 41. Moreover, the parties understood that Shah would fulfill the company's consulting obligations under the SPA. *See id.* ¶¶ 7, 30, 39, 42, 71.

Despite Plaintiffs' "expectation that Shah would immediately begin his twenty hours per month of consulting," Shah began traveling for other purposes and was difficult to contact. *Id.* ¶ 42. As a result—and given his perception that Shah was uninterested "in learning about the Glamour Dolls business"—Georgeotas contacted Brogan, who told him that even though Shah "could be difficult," "it was worth it because Shah was a 'financial wizard.'" *Id.* ¶ 43.

Around the same time, IPSY—the beauty subscription service—placed two large orders ("IPSY Purchase Orders") with Glamour Dolls totaling 808,000 units of mascara ($404,000 worth of product) to be delivered around July 16, 2018. *Id.* ¶¶ 44, 54. These orders were "standard orders from IPSY, which Glamour Dolls" had fulfilled before. *Id.* However, given the SPA, Georgotas "planned on financing" these orders through "a new means" facilitated by Shah's consulting services. *Id.* ¶ 45. But "as manufacturing deadlines approached, Shah still had only dedicated minimal time," "not the twenty hours per month" required under the SPA. *Id.* ¶¶ 7–8, 46.

On April 24, 2018, Shah joined Georgotas at a meeting with MGD. *Id.* ¶ 47. And even though he "arrived late," left early, and had a "dismissive attitude at the meeting," Shah "committed to ensuring that the pending [IPSY Purchase Orders] would be funded" by the

"looming deadlines." *Id.* ¶ 49. However, "[f]ollowing the meeting, Georgotas made several efforts to contact Shah, but Shah was completely unresponsive." *Id.* ¶ 50. This worried Georgotas, particularly because "Shah did not request any documents relating to the [IPSY Purchase Orders] for which he had promised to procure financing." *Id.* On April 26, 2018, Georgotas reached Shah, "who indicated that he did not yet have financing for the [IPSY Purchase Orders], and that he would discuss it with Georgotas" later. *Id.* ¶ 51.

However, Shah never followed up and, critically, never "follow[ed] through with his promise to" deliver funding for the IPSY Purchase Orders. *Id.* ¶ 52. As a result, Glamour Dolls staff "panicked" at the prospect of failing its largest customer, and in early May 2018, MGD—the company Glamour Dolls used to manufacture its products—expressed concern about the lack of financing given the delivery dates around July 16, 2018. *Id.* ¶ 53; *see also id.* ¶ 54 (alleging that for previous purchase orders, MGD generally began manufacturing "75 to 90 days prior to the delivery dates," with financing secured before manufacturing).

Given the lack of alternative financing, in early May 2018, Georgotas "returned to Kickfurther" to finance the IPSY Purchase Orders. *Id.*¶ 55. Specifically, he "began to organize a funding campaign on May 2, 2018, which was [ultimately] funded [at Kickfurther's relatively high interest rates], but took significant time and effort and . . . required [him] to . . . personally guarantee the company[']s debt." *Id.*

After securing Kickfurther funding, Georgotas again confronted Shah, who "advised Georgotas that he suddenly had the money to help finance the purchase order, and on or about May 4, 2018, sent Georgotas a loan agreement for a [$127,417] bridge loan." *Id.* ¶ 56. Georgotas used this bridge loan because "Glamour Dolls did not . . . have time to wait for the Kickfurther funds to be deposited into [its] account[] before manufacturing started." *Id.* Shah also "required Georgotas

to personally guarantee the loan, which [he] paid" back on May 17, 2018. *Id.* Additionally, Georgotas sought additional financing through Kickfurther on May 30, 2018. *Id.* ¶ 58. And once again, Shah ultimately provided Georgotas with a bridge loan, this time on June 27, 2018. *Id.* ¶ 59. Between the two campaigns, Georgotas had to personally guarantee approximately $500,000.00 (plus interest) of" Glamour Dolls's debt because of Kickfurther's personal debt guarantee requirement. *Id.* ¶ 58. And as a result of this late financing and the corresponding manufacturing delays, Glamour Dolls incurred "increased logistics fees," including the cost of "air freight" shipping. *Id.* ¶¶ 55, 60.

With the IPSY Purchase Orders' deadlines looming, MGD "pressed its factories" to produce at an accelerated pace, including by "overclocking," *i.e.*, "increasing the clock rate of a computer to exceed the speed certified by the manufacturer." *Id.* ¶¶ 61, 61 n.3. However, due to this overclocking, one of MGD's "cylinders cracked and caused damage to some of the product[]." *Id.* And given the tight turnaround, Glamour Dolls failed to identify the damaged goods through its quality control process. *Id.* ¶ 63.

After receiving shipments pursuant to the IPSY Purchase Orders, some of which was damaged, IPSY "told Glamour Dolls to wait before shipping new products in order to allow them time to determine exactly how many units were damaged." *Id.* ¶ 64. Glamour Dolls offered to replace any defective units, but IPSY declined. *Id.* ¶ 65 n.4. As a result of this event, "Glamour Dolls absorbed the costs of a quality control inspection," which totaled $26,308.65. *Id.* ¶ 64. During this time, "Shah offered no support" and even backed out of a meeting that Georgotas planned with M&T Bank to discuss potential financing. *Id.* ¶¶ 62, 66.

Ultimately, IPSY stopped purchasing from Glamour Dolls, leaving the company and Georgotas without its largest customer and with "over $1 million of debt." *Id.* ¶ 67. Glamour

Dolls also "fell behind on paying back debts" and "began defaulting" on its regular credit line at M&T Bank. *Id.* ¶¶ 67–68. And because of a "dispute between [the company] and Kickfurther," Glamour Dolls "could no longer utilize Kickfurther" for financing. *Id.* ¶ 69. As a result, Georgotas "was forced to lay off the entire Glamour Dolls team" in early October 2018. *Id.* ¶ 68.

In early December 2018, "Shah unilaterally decided that he was no longer going to provide any consulting services." *Id.* ¶ 69. Then, in December 2019, Riller Glam dissolved. *See id.* ¶¶ 13, 17, 71. And finally, in December 2020, Georgotas "filed for personal bankruptcy as a result of his assumption of debt related to personally guaranteeing the Kickfurther fundings." *Id.* ¶ 70

### B. Procedural History

On October 24, 2024, Plaintiffs filed their initial complaint. ECF No. 1. After Defendants filed a motion to dismiss, ECF No. 18, Plaintiff filed the FAC on April 7, 2025,[2] which asserts four claims for relief: (1) breach of contract, (2) promissory estoppel, (3) unjust enrichment, and (4) breach of implied covenant of good faith and fair dealing, *see* FAC ¶¶ 76–104. The FAC seeks "compensatory and consequential damages," "attorneys' fees," "a declaratory judgment that Riller Glam . . . is [Shah's] alter ego and that the corporate veil of Riller Glam . . . should be pierced," and pre- and post-judgment interest. *Id.* at 19. Defendants moved to dismiss the FAC on April 21, 2025. ECF No. 22; Moving Br.

## II. LEGAL STANDARD

A Rule 12(b)(6) motion "tests the legal sufficiency of a complaint under [Federal Rule of Civil Procedure 8(a)(2)'s] plausibility pleading standard," *Zanetich v. Wal-Mart Stores E., Inc.*, 123 F.4th 128, 138 (3d Cir. 2024), which requires that a "pleading . . . contain 'a short and plain

---

[2] Because Georgotas is in personal bankruptcy, he asserts that he brings his claims "on behalf of [the] Special Counsel to the Chapter 7 Bankruptcy Trustee." FAC at 1, 1 n.1; *see also* Opp'n Br. at 1.

statement of the claim showing that the pleader is entitled to relief,'" *Ashcroft v. Iqbal*, 556 U.S. 662, 677–78 (2009) (quoting Fed. R. Civ. P. 8(a)(2)). To survive dismissal under Rule 12(b)(6), "a complaint must [generally] contain sufficient factual matter, accepted as true, to 'state a claim [for] relief that is plausible on its face.'" *Id.* at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible on its face if the complaint contains "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of" the misconduct alleged. *Twombly*, 550 U.S. at 556. In evaluating a Rule 12(b)(6) motion, the Court accepts the complaint's well-pled factual allegations as true, construes them in the light most favorable to the plaintiff, and draws all reasonable inferences in the plaintiff's favor. *Lutz v. Portfolio Recovery Assocs., LLC*, 49 F.4th 323, 327–28 (3d Cir. 2022). Moreover, a defendant has the burden of showing that dismissal is appropriate under Rule 12(b)(6). *Bruni v. City of Pittsburgh*, 824 F.3d 353, 361 n.11 (3d Cir. 2016).

"Technically, the Federal Rules of Civil Procedure require a defendant to plead an affirmative defense, like a statute of limitations defense, in [an] answer, not in a motion to dismiss." *Schmidt*, 770 F.3d at 249. However, Third Circuit law allows courts to dismiss a claim pursuant to Rule 12(b)(6) based on a statute of limitations defense, but only if "the time alleged in the statement of a claim shows that the cause of action" is untimely. *Id.* (citation omitted). "[I]f the [statute of limitations] bar is not apparent on the face of the complaint, then" a court may not dismiss a claim on statute of limitations grounds under Rule 12(b)(6). *Id.* (citation omitted).

## III. <u>DISCUSSION</u>

As noted above, Plaintiffs assert four claims for relief: (1) breach of contract, (2) promissory estoppel, (3) unjust enrichment, and (4) breach of the implied covenant of good faith and fair dealing. *See* FAC ¶¶ 76–104. The parties agree that New Jersey law governs Plaintiffs'

claims. *See* Moving Br. at 10–11, 18–19; Opp'n Br. at 8, 18–19. Plaintiffs also allege that Riller Glam is Shah's alter ego. FAC ¶¶ 71–75.

To argue that dismissal is appropriate, Defendants make three arguments. First, as a threshold matter, Defendants argue that these claims "are barred by the applicable six-year statute of limitations."[3] Moving Br. at 10–11. Second, they argue that Plaintiffs' claims for promissory estoppel, unjust enrichment, and breach of the implied covenant of good faith and fair dealing are duplicative of the breach of contract claim. *Id.* at 18–20. Third, Defendants argue that Plaintiffs' have not adequately pled alter ego liability. *Id.* at 13–18.

For the reasons stated below, the Court will not dismiss Plaintiffs' claims for breach of contract, promissory estoppel, or unjust enrichment at this early stage. However, the Court will dismiss Plaintiffs' claim for breach of the implied covenant of good faith and fair dealing as duplicative of the breach of contract claim. And finally, the Court finds that Plaintiffs have adequately pled veil piercing.

### A. Plaintiffs' Breach of Contract Claim

The Court will not dismiss Plaintiffs' breach of contract claim. In New Jersey, a breach of contract claim is subject to a six-year statute of limitations period. N.J. Stat. Ann. 2A:14-1. Plaintiffs filed their initial complaint on October 24, 2024, ECF No. 1, so under a standard application of the relevant limitations period, Plaintiffs' breach of contract claim is timely only if their claim accrued on or after October 24, 2018. Defendants correctly point out that many of Plaintiffs' breach of contract allegations occurred before then, including when Shah failed to

[3] The Court has diversity jurisdiction under 28 U.S.C. § 1332 and therefore applies the substantive law of the state in which it sits. *See Gasperini v. Ctr. for Humans., Inc.*, 518 U.S. 415, 426–27 (1987) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938)). Relevant here, "[s]tatutes of limitations are characterized as substantive law for purposes of the *Erie* doctrine and when applying a state limitations period, federal courts also generally use state tolling principles." *Boldman v. Wal-Mart Stores, Inc.*, No. 16-4, 2016 WL 4418219, at *2 (D.N.J. Aug. 17, 2016).

provide consulting services "almost immediately after the SPA was signed" on March 14, 2018. Moving Br. at 11–13 (quoting FAC ¶ 42). Nonetheless, Plaintiffs' breach of contract claim is not time-barred, because their allegations are sufficient to invoke the continuing breach doctrine.

"[W]hen a party is in continuous breach of a performance obligation, courts find that this continuous failure to honor a contract creates a series of mini breaches wherein a new cause of action perpetually accrues." *R.C. Beeson, Inc. v. Coca Cola Co.*, No. 07-4806, 2008 WL 4447106, at *6 (D.N.J. Sept. 26, 2008), *aff'd*, 337 F. App'x 241 (3d Cir. 2009); *see, e.g.*, *Metromedia Co. v. Hartz Mountain Assocs.*, 655 A.2d 1379, 1381 (N.J. 1995); *Ballantyne House Assocs. v. City of Newark*, 635 A.2d 551, 555 (N.J. Super. Ct. App. Div. 1993). Indeed, the Third Circuit has noted that New Jersey courts have applied the doctrine when a "party has continuously breached a non-payment performance obligation." *Nat'l Utility Serv., Inc. v. Cambridge-Lee Indus.*, 199 F. App'x 139, 142 (3d Cir. 2006) (citing *Ballantyne*, 635 A.2d at 555–56).

The Court finds the application of the "continuing breach" doctrine appropriate at this early stage. The relevant provision of the SPA required continuous performance from Riller Glam (through Shah). *See Ballantyne*, 635 A.2d at 555–56; *see also Welch Foods, Inc. v. Borough of N.E.*, 46 F. App'x 678, 682 (3d Cir. 2002) ("A continuing contract is one which requires, 'continuing (or continuous) performance for some specified period of time, a period that may be definite or indefinite when the contract is made." (citation omitted)). And because "[a]t least some of Defendant[s'] alleged breaches of the [SPA] occurred less than six years before Plaintiff[s] filed suit," *Richer Mktg. Inc. v. Fairfield Gourmet Foods Corp.*, No. 15-6793, 2017 WL 3641742, at *3 (D.N.J. Aug. 24, 2017), the Court finds that it is not apparent on the face of the FAC that Plaintiffs' breach of contract claim is time-barred, *Schmidt*, 770 F.3d at 249; *see, e.g.*, FAC ¶ 69 (alleging

that Shah "unilaterally decided that he was no longer going to provide *any* consulting services" in December 2018).

Defendants make two points in response, both of which are unavailing. First, they argue that the SPA is "not an installment contract that can be split up into separate and distinct transactions." Reply Br. at 6. But the "continuing breach" doctrine applies not only to pure installment contracts, but also to situations of continuous breach.[4] *See Nat'l Util.*, 199 F. App'x at 142 ("But in the case of installment or continuous contracts, a cause of action arises for each periodic breach that occurs, absent total repudiation."); *Legal Cap. Grp., LLC v. Callagy*, No. 20-5124, 2025 WL 999824, at *6 n.4 (D.N.J. Mar. 31, 2025) ("[T]he continuous breach doctrine is not limited to installment contracts."); *R.C. Beeson*, 2008 WL 4447106, at *6.

Second, Defendants argue that "[t]he application of the continuing breach [doctrine] does not help Plaintiffs in any event," because "any breaches that allegedly occurred after October 24, 2018[,] are not the gravamen of Plaintiffs' Complaint or the basis for their claimed damages." Reply Br. at 6–7. That argument, however, speaks primarily to the magnitude of Plaintiffs' damages—not to whether Plaintiffs have alleged a plausible breach of contract claim. *Richer Mktg.*, 2017 WL 3641742, at *3 n.4; *see also Emerus Hosp. v. Health Care Serv. Corp.*, No. 138906, 2016 WL 946916, at *8 (N.D. Ill. Mar. 14, 2016) ("The amount of plaintiffs' recovery . . . is not relevant to whether plaintiffs have sufficiently stated a claim pursuant to Rule 12(b)(6)."). Relatedly, "whenever there is a breach of contract . . . , the law vindicates the right by

[4] Moreover, the SPA may be an installment contract. "An installment contract is one in which the agreed performance of at least one of the parties is to be rendered, not as a whole at one time and place, but piecemeal at different times or different places." *Interstate Realty Mgmt. Co. v. Cmty. Realty Mgmt. Inc.*, No. ATL-L-4283-05, 2007 WL 6875818 (N.J. Super. Ct. Nov. 02, 2007) (citation omitted). The SPA, as alleged, fits that description: in exchange for an equity stake in Glamour Dolls, Riller Glam (via Shah) agreed to perform 20 hours of consulting services monthly, *i.e.*, consulting services "piecemeal at different times." *Id.*; *see* FAC ¶¶ 7–8, 30, 39, 42.

awarding nominal damages.'"[5] *Sunbelt Rentals, Inc. v. Love*, No. 20-17611, 2021 WL 82370, at *20 (D.N.J. Jan. 11, 2021) (citation omitted). As such, the Court will not dismiss Plaintiffs' breach of contract claim on statute of limitations grounds.

**B. Plaintiffs' Promissory Estoppel & Unjust Enrichment Claims**

The Court will not dismiss Plaintiffs' promissory estoppel or unjust enrichment claims. Federal Rule of Civil Procedure 8(d)(2) allows a litigant to "set out 2 or more statements of a claim . . . alternatively" and provides that a "pleading is sufficient if any one [of the alternative claims] is sufficient." Fed. R. Civ. P. 8(d)(2). Here, Plaintiffs assert quasi-contract claims for promissory estoppel and unjust enrichment as alternatives to their breach of contract claim. Opp'n Br. at 1 n.2; *see Campbell v. Heartland Payment Sys., Inc.*, No. 16-1104, 2016 WL 11737843, at *4 (D.N.J. Sept. 26, 2016) ("[U]nder 'New Jersey law, if a valid contract exists, a claim for promissory estoppel must fail.'" (citation omitted)); *id.* at *3 (same for unjust enrichment). As explained above, the Court will not dismiss Plaintiffs' breach of contract claim at this early stage. Therefore, the Court finds it premature to dismiss Plaintiffs' quasi-contract claims pursuant to Rule 12(b)(6). *See Corps Logistics, LLC v. Dutil*, No. 20-6683, 2021 WL 795198, at *10 (D.N.J. Feb. 28, 2021) ("Here, although Plaintiffs have adequately *pled* a claim for breach of contract, the Court does not, at this time, find that a valid contract between the parties exists. . . . The Court, therefore, denies Defendants' Motion to Dismiss [Plaintiffs' promissory estoppel claim]."); *Campbell*, 2016 WL 11737843, at *4 (similar); *MK Strategies, LLC v. Ann Taylor Stores Corp.*, 567 F. Supp. 2d 729, 736 (D.N.J. 2008) (collecting cases applying Rule 8(d)(2)).

---

[5] Plaintiffs do not explicitly request nominal damages, but they do ask for "[s]uch other relief as the Court deems just and appropriate," FAC at 19, which is generally sufficient to encompass a request for nominal damages, *see Mitchell v. Horn*, 318 F.3d 523, 533 n.8 (3d Cir. 2003) (also noting that "it is not necessary to allege nominal damages" (citation omitted)).

**C. Plaintiffs' Breach of the Implied Covenant Claim**

The Court will dismiss Plaintiffs' claim for breach of the implied covenant as duplicative of their breach of contract claim. Under New Jersey law, every contract contains an implied covenant of good faith and fair dealing, which requires that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Wilson v. Amerada Hess Corp.*, 773 A.2d 1121, 1126 (N.J. 2001) (citation omitted). However, "[a] claim for breach of [the implied] covenant of good faith and fair dealing . . . cannot proceed 'unless the underlying conduct is distinct from that alleged in a corresponding breach of contract claim.'" *Ohm Sys., Inc. v. Senergene Sols., LLC*, No. 23-1340, 2023 WL 8437279, at *3 (D.N.J. Dec. 5, 2023) (quoting *MZL Cap. Holdings, Inc. v. TD Bank, N.A.*, 734 F. App'x 101, 106 (3d Cir. 2018)). "New Jersey law allows for an independent breach of the implied covenant of good faith and fair dealing cause of action in three situations: '(1) to allow the inclusion of additional terms and conditions not expressly set forth in the contract, but consistent with the parties' contractual expectations; (2) to allow redress for a contracting party's bad-faith performance of an agreement, when it is a pretext for the exercise of a contractual right to terminate, even where the defendant has not breached any express term; and (3) to rectify a party's unfair exercise of discretion regarding its contract performance.'" *Id.* (citation omitted).

Here, Plaintiffs' theory of their breach of the implied covenant of good faith and fair dealing claim is premised on Defendants' failure to provide consulting services, which is the conduct that Plaintiffs allege gives rise to their breach of contract claim. For example, Plaintiffs allege that Shah breached the implied covenant of good faith and fair dealing by failing to "review Glamour Dolls' strategic plans, business models, and financial structure." FAC ¶ 91(b). However, these allegations overlap with Plaintiffs' breach of contract claim, as the FAC makes clear that any time spent reviewing strategic plans, business models, and financial structure, would have counted

towards the monthly 20-hour consulting obligation under the SPA. *See, e.g.*, *id.* ¶ 42; *compare also* FAC ¶ 91(c) ("Defendants breached their duty of good faith and fair dealing because they failed to . . . provide strategic consulting services."), *with id.* ¶ 80 ("Defendants breached the SPA by failing to provide twenty hours per month of strategic consulting and/or marketing consulting."). As such, the Court will dismiss Plaintiffs' claim for breach of the implied covenant of good faith and fair dealing. *See Cedar Holdings, LLC v. Menashe*, No. 16-7152, 2017 WL 1349321, at *3 (D.N.J. Apr. 7, 2017).

**D. Plaintiffs' Veil Piercing Allegations**

The Court finds that Plaintiffs have plausibly alleged alter ego liability. As an initial matter, the parties briefed the issue of veil piercing under both New Jersey and Kentucky law. *See, e.g.*, Moving Br. at 15; Opp'n Br. at 15 n.5. But under New Jersey's choice-of-law rules,[6] "the law of the state of incorporation or formation" governs veil piercing issues. *In re Mee Apparel, LLC*, No. 15-5697, 2016 WL 3535805, at *6 n.8 (D.N.J. June 28, 2016). Thus, the Court must apply Kentucky veil piercing law, because Plaintiffs allege that Riller Glam was incorporated in Kentucky. FAC ¶¶ 13, 15–16, 71.

Plaintiffs seek to pierce Riller Glam's corporate veil on the theory that the company is Shah's alter ego. *Id* ¶ 16; *id.* at 19; Opp'n Br. at 14–18. Under Kentucky law, alter ego liability attaches only if a litigant demonstrates the following two elements: "(1) domination of the corporation resulting in a loss of corporate separateness" (the "Corporate Separateness Element") and "(2) circumstances under which continued recognition of the corporation would sanction fraud or promote injustice" (the "Fraud or Injustice Element"). *Pro Tanks Leasing v. Midwest Propane*

---

[6] Because it is exercising diversity jurisdiction, the Court must apply New Jersey's choice-of-law rules to determine which state's veil piercing law governs. *Calhoun v. Yamaha Motor Corp., U.S.A.*, 216 F.3d 338, 343 (3d Cir. 2000); *see, e.g.*, *Pasternack v. Klein*, No. 14-2275, 2017 WL 10810183, at *7 (E.D. Pa. July 24, 2017), *aff'd*, 751 F. App'x 332 (3d Cir. 2018).

*& Refined Fuels, LLC*, 988 F. Supp. 2d 772, 784 (W.D. Ky. Dec. 18, 2013) (quoting *Inter-Tel Techs., Inc. v. Linn Station Props*., *LLC*, 360 S.W.3d 152, 165 (Ky. 2012)). On the Corporate Separateness Element, the Kentucky Supreme Court has outlined a list of factors for courts to consider,[7] with the following as the "most critical" factors: (1) "grossly inadequate capitalization," (2) an "egregious failure to observe legal formalities and disregard of distinctions between parent and subsidiary," and (3) "a high degree of control by the parent over the subsidiary's operations and decisions, particularly those of a day-to-day nature." *Inter-Tel*, 360 S.W.3d at 164. On the Fraud or Injustice Element, the Kentucky Supreme Court recognized that fraud will be sanctioned or injustice will be promoted where, as a result of continued respect for the corporate form, (1) "a party would be unjustly enriched," (2) "a parent corporation that caused a sub's liabilities and its inability to pay for them would escape those liabilities," or (3) "an intentional scheme to squirrel assets into a liability-free corporation while heaping liabilities upon an asset-free corporation would be successful." *CNH Cap. Am. LLC v. Hunt Tractor, Inc.*, 568 F. App'x 461, 468 (6th Cir. 2014) (quoting *Inter-Tel*, 360 S.W.3d at 164). Conversely, the Fraud or Injustice Element is not satisfied merely because plaintiff would be unable to collect a debt. *See id.* at 467 (citing *Inter-Tel*, 360 S.W.3d at 165).

---

[7] Those factors are: "a) Does the parent own all or most of stock of the subsidiary? b) Do the parent and subsidiary corporations have common directors or officers? c) Does the parent corporation finance the subsidiary? d) Did the parent corporation subscribe to all of the capital stock of the subsidiary or otherwise cause its incorporation? e) Does the subsidiary have grossly inadequate capital? f) Does the parent pay the salaries and other expenses or losses of the subsidiary? g) Does the subsidiary do no business except with the parent or does the subsidiary have no assets except those conveyed to it by the parent? h) Is the subsidiary described by the parent (in papers or statements) as a department or division of the parent or is the business or financial responsibility of the subsidiary referred to as the parent corporation's own? i) Does the parent use the property of the subsidiary as its own? j) Do the directors or executives fail to act independently in the interest of the subsidiary, and do they instead take orders from the parent, and act in the parent's interest? k) Are the formal legal requirements of the subsidiary not observed?" *Inter-Tel*, 360 S.W.3d at 163–64.

Here, Plaintiffs have adequately pled that Riller Glam is an alter ego of Shah. On the Corporate Separateness Element, Plaintiffs allege that Shah incorporated Riller Glam "for the sole purpose of purchasing shares in Glamour Dolls" and was the "sole owner, founder, member[,] and officer of Riller Glam." FAC ¶¶ 71–72. Indeed, Plaintiffs allege that Riller Glam "filed for incorporation on . . . the same date" that the SPA was executed. *Id.* ¶ 71. Moreover, they allege that Riller Glam had no employees and that Shah conducted Riller Glam's business using his "personal email address." *Id.* ¶¶ 73–74. And they allege that Shah operated Riller Glam and his various other business ventures out of the same location and using his same personal email address. *Id.* ¶ 74. Taken together, these allegations are sufficient to satisfy the second and third critical factors of the Corporate Separateness Element: Riller Glam's disregard of distinctions between it and Shah, and Shah's high degree of control over Riller Glam. *See Inter-Tel*, 360 S.W.3d at 164. Plaintiffs' allegations are also sufficient to satisfy several other relevant factors. *See id.* at 163 ("a) Does the parent own all or most of stock of the subsidiary? . . . g) Does the subsidiary do no business except with the parent or does the subsidiary have no assets except those conveyed to it by the parent? . . . i) Does the parent use the property of the subsidiary as its own? j) Do the directors or executives fail to act independently in the interest of the subsidiary, and do they instead take orders from the parent, and act in the parent's interest?"). As such, Plaintiffs have plausibly alleged the Corporate Separateness Element. *See Granite State Ins. Co. v. Taylor*, No. 22-119, 2025 WL 1900030, at *4–5 (W.D. Ky. July 9, 2025) (finding the Corporate Separateness Element satisfied where one critical factor weighed heavily in favor of piercing the corporate veil, whereas the other two critical factors weighed against or were neutral); *Pro Tanks*, 988 F. Supp. 2d at 792 (finding that the first factor was satisfied where "two of the three 'critical' factors [favored] of

such a finding"); *Arapahoe Res., LLC v. Pro. Land Res., LLC*, No. 15-10, 2015 WL 4887321, at *3 (E.D. Ky. Aug. 17, 2015) (same).

On the Fraud or Injustice Element, Plaintiffs allege that Shah used Riller Glam to secure his investment in Glamour Dolls, but then caused Riller Glam to breach the SPA by failing to provide consulting services. *See* FAC ¶¶ 1, 16, 34, 39, 42–43, 46, 68–69; SPA at 7. They further allege that about a year after Glamour Dolls failed, Riller Glam dissolved. *See* FAC ¶¶ 13, 68. These allegations are sufficient to satisfy the Fraud or Injustice Element. Taken together, they demonstrate that Shah—as the person with complete control over Riller Glam—caused Riller Glam to incur an obligation under the SPA, placed Riller Glam in breach of the SPA by failing to provide services, and then dissolved the company. Thus, continued recognition of Riller Glam's corporate form would allow Shah to "pocket the proceeds" from the SPA without incurring the contracted for detriment and "then assert[] the shield of the corporate form to avoid a true reckoning." *Pike Cnty. Fiscal Ct. v. RCC Big Shoal, LLC*, No. 20-75, 2020 WL 6937444, at *4 (E.D. Ky. Nov. 24, 2020). At this early stage, this is sufficient to satisfy the Fraud or Injustice Element. *See Johnson v. BLC Lexington, SNF, LLC*, No. 19-64, 2019 WL 6053012, at *7 (E.D. Ky. Nov. 15, 2019); *Ky. Petroleum Operating Ltd. v. Golden*, No. 12-164, 2015 WL 927358, at *8 (E.D. Ky. Mar. 4, 2015) (finding the Fraud or Injustice Element satisfied where the person who "control[led] and direct[ed] all the KPO entities[] incurred liability on behalf of the KPO debtors by executing both the Macar and 7921 PSAs on behalf of the KPO debtors" and "then rendered the KPO debtors unable to meet their PSA obligations"); *see also Walters v. Gill Indus., Inc.*, No. 21-69, 2022 WL 100218, at *6 (E.D. Ky. Jan. 10, 2022) (finding that "the continued recognition of separate entities would promote injustice" where plaintiff contended "that the defendants intentionally restructured their bank accounts so that Gill Industries, Inc. would not have funds to

pay its employees under the Retention Agreement"). Accordingly, Plaintiffs have plausibly alleged that Riller Glam is an alter ego of Shah.

## IV. CONCLUSION

Accordingly, for the reasons stated above, **IT IS** on this 28th day of July 2026;

**ORDERED** that the Defendants' motion to dismiss (ECF No. 22) is **GRANTED IN PART** and **DENIED IN PART**; and it is further

**ORDERED** that Plaintiffs' claim for breach of the implied covenant of good faith and fair dealing is **DISMISSED WITHOUT PREJUDICE**; and it is further

**ORDERED** that all other claims in the FAC shall proceed; and it is finally

**ORDERED** that Plaintiffs shall have thirty (30) days from entry of this Opinion and Order to submit a second amended complaint that addresses the deficiencies identified in this Opinion and Order. Insofar as Plaintiffs decide to amend, they shall also provide a form of the second amended complaint that indicates in what respect it differs from the FAC, by bracketing or striking through materials to be deleted and underlining materials to be added. *See* L. Civ. R. 15.1(b)(2).

**SO ORDERED**.

*/s/ Claire C. Cecchi*
**CLAIRE C. CECCHI, U.S.D.J.**